**HAMMOND, Plaintiff, v. YOUNG et, Defendants.**

Common Pleas Court, Montgomery County.

No. 106581.   Decided December 14, 1953.

172

George J. Donson, Dayton, for plaintiff.

Mathias H. Heck, Dayton, for Montgomery County Board of Elections.

Herbert S. Beane, Dayton, for the City Commission of Dayton.

Pierce Wood, Dayton, for defendants.

## OPINION

By McBRIDE, J.

This case was submitted on a statement of facts pursuant to §2315.24 R. C., such additional facts as the court indicates herein are judicially recognized, the arguments and briefs.

The only pleading, designated as a submission of agreed case, reads as follows:

"1. Howard L. Hammond is a taxpayer, residing in the City of Dayton, Ohio.

"2. Howard C. Young, Fred L. Van Allen, Albert A. Horstman and Pierce Wood are the duly appointed, qualified and acting members of the Montgomery County Board of Elections.

"3. Louis W. Lohrey, Howard R. Malone, Merle P. Smith, John C. Csipkar and Henry S. Stout are the duly elected, qualified and acting members of the City Commission of Dayton, Ohio.

"4. Under Sections 48 and 49 of the General Ordinances of the City of Dayton, adopted in 1911, the City of Dayton is divided into twelve wards.

"5. Due to shifts of population and annexation of new territory to the City, the area and population of said wards are unequal.

"6. Sec. 731.06 R. C. provides:

" 'The legislative authority of a city shall, after each recurring federal census, and within three months after the

issuance of the proclamation by the secretary of state of the population of the city, and when there is annexed thereto any territory containing, according to the last federal census, such number of inhabitants as will entitle the city to an additional member of the legislative authority, subdivide the city into wards, equal in number to the members of the legislative authority therein to be elected from wards. If the legislative authority fails to make such subdivision within the time required, on the application of its president, it shall be made by the director of public service. All wards shall be bounded, as far as practicable, by county lines, streets, alleys, corporation lines, center lines of platted streets, or railroads, and shall be composed of adjacent and compact territory, as nearly equal in population as practicable.'

"7. The Charter of the City of Dayton provides that the City shall have all those powers theretofore granted to it by the Legislature. The Charter is attached hereto and made a part hereof.

"8. The Board of Elections has been advised by the City Law Director that since the City Commission of Dayton no longer is elected on a ward basis, no reason exists for the City Commission further to concern itself with wards and ward boundaries.

"9. **Sec. 3501.18 R. C.** provides:

" 'The board of elections may divide a political subdivision, within its jurisdiction, into precincts or districts and may change the boundaries thereof. The election returns shall be compiled and reported by the board according to such precincts or districts.'

"10. **Sec. 3501.11 (p) R. C.** provides that the Board of Elections shall 'perform such other duties as are prescribed by law or the rules of the Secretary of State.'

"11. Acting under said sections and under its general powers, the Board of Elections has made the necessary changes in creating new precincts and adding them to existing wards each time a tract has been annexed to the City of Dayton since 1911. However, no new wards were ever created by resolution or otherwise. Such action has not been protested by the taxpayer herein or by any other taxpayers.

"12. To equalize the size of the wards and to facilitate the establishment, re-arrangement and combination of election precincts, the Board of Elections of Montgomery County, Ohio, has passed a resolution increasing the number of wards from twelve to eighteen and re-drawing their boundaries.

"13. The taxpayer has challenged this action on the part of the Board of Elections claiming that it does not have the

power and authority to create new wards and to re-draw ward boundaries.

"WHEREFORE, the partiees hereto unite in submitting the foregoing facts to the Court for its judgment upon the following questions:

"1. Is the resolution of the Board of Elections referred to in Paragraph 12 valid?

"2. If the answer to question 1 is in the negative, does the City Commission of Dayton, Ohio, have the power to create new wards and re-draw ward boundaries within the City of Dayton?

"3. If the answers to questions 1 and 2 are in the negative, what governmental body possesses the power to create new wards and re-draw ward boundaries within the City of Dayton?"

In the election code, a political subdivision is defined as a county, township, city, village or school district. Precinct is defined as "a **district** within a county established by the board of elections of such county within which all qualified electors having a voting residence therein may vote at the same polling place." No definition is provided for "ward" or "district."

"Ward" is of teutonic origin and has a variety of meanings all of which spring from the general idea of a military guard or protector. Thus a section of a hospital or prison is identified as a ward. Probably in this sense, the word was adopted to include one of the sections into which a town is divided "for election purposes" and as used here it has few legal implications. The person elected from such section is considered a protector of a geographical part as distinguished from the city as a whole. Ballentine's Law Dictionary defines ward as "A person over whom or over whose property a guardian has been appointed; a municipal district; in English cities, a municipal district under the supervision of an alderman; the service of guarding a castle." A ward is a local geographical subdivision of a city or village. State v. Gora, 195 Wis. 515, 218 N. W. 839. For convenience, municipal corporations are usually divided into boroughs or wards, and in larger cities into precincts, sanitary, police, sewer, park and other districts. Wards do not possess any power of local self government although districts frequently do. Wards exist exclusively for the purpose of securing local group representation in large city governments and in the last century, securing representation in political parties. Wards are merely convenient territorial divisions for that purpose. Establishing or changing wards is a legislative act and authority to perform it must

be found in constitutions or statutes. McQuillin on Municipal Corporations, 3rd Ed., State v. Milwaukee, 150 Wis. 616, 138 N. W. 76.

"District" derives its meaning and significance from the latin, meaning jurisdiction. The word describes a special geographical area over which specific authority, executive, legislative or judicial is exercised by properly constituted officers. The word usually expresses this significant meaning in the statutes although it sometimes has a general meaning. Examples are found in judicial, school, sanitary, sewer, flood, park and other districts, the geographical area of which is determined by an enabling act or by vote of the people.

The board of elections has complete control over the establishment and regulation of precincts, the vital operating unit by which voting is conducted and reported. The board is thus able to adjust mechanics of reporting to ever changing lines of ward, city, village and districts within the county.

'For over a century, wards have been and still are the legal units recognized for the purpose of electing councilmen for the legislative bodies of Ohio cities. Political organizations were built upon this framework of local subdivisions. For example, §3517.03 R. C. provides that a county central committee shall consist of one member of **each ward in the city.** During all of these years, the right to change wards has remained with a legislative body as distinguished from an administrative agency. It is significant that in early times the county commissioners had power to subdivide townships so that boundaries of precincts corresponded with those of wards of a city. Act of March 4, 1853 (2 S. & C. 1573), **State v. Ward, 17 Oh St 544.**

Election laws avoid reference to wards, other than accepting them as areas which exist within municipal corporations.

Recognition of the development and importance of the wards will be observed by comparison of the Constitution of Ohio of 1802 with that of today:

"* * * but no person shall be entitled to vote, except in the County or district in which he shall actually reside at the time of the election."

now reads:

"Every citizen of the United States, of the age of twenty-one years, who shall have been a resident of the state one year next preceding the election, and of the **county, township, or ward,** in which he resides, such time as may be provided by law, shall have the qualifications of an elector, and be entitled to vote at all elections." (Art. V, Sec. 1 as amended November 6, 1923.)

It will be observed that local residential requirements for voting are "county, township, or ward" and not precinct.

Adjustment of the size of wards has been a matter of municipal control for over a century. Laws governing municipal corporations were codified May 7, 1869 (66 Ohio Laws 149). Section 407 provided that annexed territory may be "organized into a new ward or wards, or attached to any existing ward or wards, as the council may deem proper." This was re-enacted in Section 1630 of the Revised Statutes of 1880. In 1893, a section was enacted which provided that "upon such annexation, the board of legislation shall, by ordinance, provide for the division of such annexed municipality or municipalities into wards." This was the condition of the statutes when the Court of Common Pleas of Hamilton County, State v. Cincinnati, 3 O. N. P. 127, sustained the method of establishing wards for villages annexed to Cincinnati and indicated that "representation by population is the settled policy of the State of Ohio, and under this policy there should be an approximate equality of voters in representative districts."

Title VII, Chapter 731 of the Revised Code now provides that the legislative power of a city shall be vested in a legislative authority, composed of not less than seven members, four of whom shall be elected by wards and three of whom shall be elected by electors of the city at large. **Sec. 731.02 (4206 GC) R. C.** This section sets up a schedule by population for additional members. Since the federal census revealed a population of 243,872 in 1950, Dayton would be entitled to 23 councilmen, 19 of whom would be elected by wards and four at large. Schedule in Weinland's Ellis' Ohio Municipal Code, 8th Edition (1929); **Zumstein v. Mullen, 67 Oh St 382.**

Creation of additional wards required by annexation or increased population within a municipality has for many years been consolidated in §731.06 (4212 GC) **R. C.**, which reads as follows:

**"The legislative authority of a city shall, after each recurring federal census,** and within three months after the issuance of the proclamation by the secretary of state of the population of the city, **and when there is annexed thereto any territory containing, according to the last federal census, such number of inhabitants as will entitle the city to an additional member of the legislative authority, subdivide the city into wards, equal in number to the members of the legislative authority therein to be elected from wards.** If the legislative authority fails to make such subdivision within the time required, on the application of its president, it shall be made

by the director of public service. All wards shall be bounded, as far as practicable, by county lines, streets, alleys, avenues, public grounds, canals, watercourses, municipal corporation lines, center lines of platted streets, or railroads, and shall be composed of adjacent and compact territory, as nearly equal in population as practicable."

**Chapter 705** of the **Revised Code** which contains provisions for the various plans for the organization of municipal governments frequently refers to wards. Wherever councilmen are to be elected from representative areas of the city, the statute requires the council to divide the municipality into wards.

1.

The first question presented in this case is whether or not the resolution of the Board of Elections increasing the number of wards from twelve to eighteen and re-drawing their boundaries is a valid order. There is no express statute or direct authority granting such power. To sustain the action of the Board, we are asked to construe the word "district" in §3501.18 **R. C.** to include "ward," despite the fact that §3501.01 **R. C.** defines precinct as a district. Because of recodification and an amendment, it is necessary to consider both versions of §3501.18 **R. C.** The present version, effective until December 31, 1953, reads as follows:

"The board, when it deems it necessary for election administration purposes, may divide a political subdivision, within its jurisdiction, into **precincts or districts** and may change the boundaries thereof. The election returns shall be compiled and reported by the board **both according to such precincts or districts.**"

The first sentence means that the board may divide a political subdivision either into precincts **or** districts. Organization into one form eliminates use of the other.

The second version of §3501.18 **R. C.**, effective January 1, 1954, eliminates the word "district," and reads, in part, as follows:

"The board of elections may divide a political subdivision, within its jurisdiction, into precincts and establish, define, divide, rearrange, and combine the several election precincts within its jurisdiction and change the location of the polling place for each precinct as often as necessary * * *."

The purpose of the amendment is clear. It increases the control of the board over precincts and removes the confusion arising from the use of an undefined word which encouraged the board to adopt the present resolution.

In the absence of a clear grant of authority, this section

cannot defeat the power of a municipal corporation nor operate to increase that of the Board of Elections.

Our conclusion on the first question is that wards are legislative creatures of local, municipal convenience. The Board of Elections is an administrative agency and may not usurp legislative functions of a political subdivision. The board has no authority to establish or change boundaries of wards within a municipality and the resolution attempting to do so is void.

**2.**

The second question presented is whether the City Commission of Dayton, Ohio, has power to create new wards and re-draw ward boundaries within the City of Dayton. This question arises under the Charter because members of the Commission are elected at large and not from representative areas.

Prior to the Charter, Dayton exercised statutory control over wards, the last ordinance having been adopted March 13, 1911. Section 48 provided:

"That the City of Dayton, State of Ohio, be and it is hereby subdivided into twelve wards, which are equal in number to the members of Council, who are hereafter to be elected from wards according to law and said twelve wards are hereby created and established in this City, and the boundaries thereof shall be such as are hereinafter set forth, which boundaries are so fixed as that each ward shall contain as nearly as practicable an equal number of inhabitants." Sec. 1: Ord. 8547.

Section 2 of that ordinance, now identified as Section 49 of the Code of General Ordinances of the City of Dayton, described the boundaries and fixed the geographical area of the twelve wards. This ancient and obsolete description of wards in Dayton has never been modified or repealed except as to such increases as resulted from formal annexations which were not formally incorporated into existing wards.

The "home rule" amendment to the Constitution of Ohio was adopted September 3, 1912, and pursuant to that amendment, Dayton adopted its City Charter on August 12, 1913.

When Sections 48 and 49 were adopted by the Council in 1911, it was a matter of public knowledge and law that the ordinance performed two functions: (1) the election of members to the City Council and (2) the election of ward committeemen for representation on committees of the two political parties. The first function ceased upon the adoption of the Charter in 1913.

Section 166 of the Charter, as originally adopted and still in effect, provides,

"All ordinances and resolutions in force at the time of the taking effect of this charter, not inconsistent with its provisions, shall continue in force until amended or repealed."

Many remarkable men, including experienced lawyers, participated in the preparation, adoption and early experiences under the Charter. City officials never removed Sections 48 and 49 as being inconsistent with the Charter. On the contrary, these sections have been included in every revision of the Code of General Ordinances of the City of Dayton, including the compilation and publication of the ordinances of a general and permanent nature in effect March 15, 1940. (Loose leaf edition.) This continued acceptance indicates an opinion of the framers of the Charter and city officials to date that the existence of the section creating twelve wards was performing a continuing useful function not inconsistent with the purpose of the Charter.

At the same time it must be conceded that the same parties failed to keep the sections up to date when territory was annexed.

The "home rule" amendment to the Constitution authorizes a municipality to adopt a charter for its government and to exercise **ALL POWERS OF SELF GOVERNMENT. Article 18, Section 7.**

It cannot be said that the Dayton Charter is lacking in enabling power. The Charter includes many worthy purposes, including "promoting the peace, good government and welfare of the city and for the performance of the functions thereof," which could very well have been intended to include regulation of wards. Section Two of the Charter follows with the inclusion of "all other powers which, under the Constitution and **laws of Ohio, it would be competent for this Charter specifically to enumerate.**"

With respect to the statutory authority, it is significant that the Charter expressly enumerates such powers as "now are, or hereafter may be granted to municipalities by the * * * laws of Ohio." It is a statute that gives every other city the power to regulate wards and in its Charter, the city unmistakably includes such statute.

As to wards established by Sections 48 and 49, it is the opinion of the court that they were not disturbed by the adoption of the City Charter. A somewhat similar condition existed in Cleveland when the people amended the charter to include the following:

"The division of the city into wards existing at the time of the adoption of this amendment, shall continue until changed by the council as provided herein * * *."

180

The court in Morrow v. Cleveland, 73 Oh Ap 460, 29 O. O. 136, said that the people expressed an intention to adopt and reestablish the ward boundaries as they were created under the Charter of 1914 even though such wards had not been used for the election of members of council. Judge Skeel wrote:

"But the charter of 1921 did not have the effect of disturbing the wards as previously defined, except that they no longer were the basis upon which membership in the city council was to be determined. It is a matter of common knowledge that ward organizations retained their identity and continued as integral parts of our major political parties as provided by law and that the wards as created under the authority of the charter of 1914, after the census of 1920, were used in the conduct of all elections, local, state and nation, except for that of councilmanic candidates."

Morrow v. Cleveland is also authority to judicially recognize facts surrounding the adoption of a city charter as well as the fact that ward organizations retained their identity and continued to exist as a vital and integral part of our political government within a municipality. This court also recognizes that since 1911, wards in Dayton have changed disproportionately in population and in area so that there is no longer any semblance of equality.

In State v. Stewart, 52 Neb. 243, 71 N. W. 998, the court stated that

"Attention has been called to the repeal of Section ten of the old law, which provided for the dividing of the city into wards, and from the fact of such repeal it is argued that ward lines have been effectually destroyed and obliterated, and the authority to create others is taken away. * * * We are constrained to hold that while the repeal of said Section 10 destroyed or took away the authority to create wards, it did not have the effect to abolish existing wards."

The constitutional authority to charter cities to "exercise all powers of local self-government" includes the exercise of all public or governmental powers and functions for the conduct of the affairs of the people within the city except for the limitation upon the power to levy taxes and incur debts. Because of this unlimited power of self government under the Charter and the legislative policy of Ohio fixing apportionment of wards as a municipal duty, the court is only required to decide if the City Charter deprived the City Commission of power to regulate wards. It was admitted in oral arguments that the Charter which determines the method of electing Commissioners is not inconsistent with the secondary function of the statute which authorizes cities to regulate ward lines.

Because the Charter and the statute involved do not have the same source, the Charter being supported directly by the people, some of the tests of construction of enactments of the same origin are not necessarily applicable. It is a duty of the court to harmonize, if possible, the provisions of the Charter with those of the General Code. In the absence of express language in the Charter, showing that it conflicts with the statute, the court must attribute an intention to the framers of the Charter to harmonize the Charter with the Code. **State v. Kerr, 42 Oh Ap 19,** affirmed in **126 Oh St 26.** Difficulty in reconciliation does not necessarily call for repeal by implication. Except where an act covers the entire subject matter of earlier legislation, is complete in itself, and is evidently intended to supersede the prior legislation on the subject, it does not by implication repeal an earlier act on the same subject, unless the two are so clearly inconsistent and repugnant that they cannot, by a fair and reasonable construction, be reconciled and effect be given to both. The repugnancy between the two statutes must be irreconcilable to constitute repeal by implication. Such repeals are not favored by the courts. **37 O. Jur., Section 136, et seq. p. 397.**

True, §731.06 (4212 GC) R. C. expresses but one function, the election of councilmen, and generally a law may not be construed to embrace subjects other than those described. However, in construing a law of doubtful meaning or application, the policy which induced its enactment or which was designed to be promoted thereby (equal municipal representation) is a proper consideration. The court may take into consideration the settled legislative policy of the state in so far as it may throw light on the intent of the legislature, or of the people in the instance of a Charter. **37 O. Jur., page 675.** Other general aids of construction and interpretation support the authority of the City Commission of Dayton, Ohio, to regulate wards under the Charter and the laws of Ohio for any necessary or lawful purpose.

As the court has indicated the statutes of Ohio and the historical development of parties, known to all, clearly indicate that the division of cities into wards is a legislative matter for local legislative authorities. In view of strong evidence of an established and recognized practice, based upon the secondary function of §731.06 (4212 GC) R. C. the court finds that the people of Dayton did not intend to deprive the City Commission of the power to divide and regulate wards for any lawful, useful, or necessary purpose.

\* \* \* \*

The serious nature of the question requires the court to discuss an additional phase of this generally misunderstood

situation. The statement issued to the people of Dayton by the original Charter Commission, as appears in the Exhibit, recited that:

"Party politics are eliminated. No party designations will appear on the ballot. Ward lines are abolished. The city is considered a unit, insuring to all parts of the city equal representation."

This statement resulted in confused thinking on partisan and ward subjects in Dayton. That the Charter did abolish political activities or that such activities are of such an unsavory nature that our Commission may not recognize that they do exist is unfortunately so prevalent an opinion that it has prevented any demand for legislative action on wards for over forty years.

Partisan politics have not been eliminated in Dayton. Ward lines were not abolished. They exist and are recognized by law. Charter or municipal acts abolishing wards or partisan activities for other than municipal purposes would be void as beyond the scope of the Charter. The moment the sphere of local self government ceases, the power of the city, even under home rule, also ceases.

The statement of the Charter Commission was intended to apply only to the municipal branch of the government. It did not and could not have any affect upon the interest or rights of the people of Dayton in county, state and national affairs. Misconception of the Charter arising out of the statement of the Charter Commission has resulted in a false impression that the city does not have the established legal power given to local authorities to establish wards for lawful purposes other than municipal elections. The need for continued regulation of wards arises out of the right of the people of Dayton to participate in and enjoy good government in the affairs of the county, state and nation according to the established policy of Ohio that the local subdivisions determine the number and boundaries of the representative political units in every city. Citizens of Dayton do participate in politics, but the failure of the Commission to modernize wards prevents Daytonians from doing so according to the settled policy of Ohio of equality of representation in committee councils of the two political parties. That "no reason exists" under the Charter is an immaterial explanation based upon an inference that is false and ignores the usual, broad legislative test of general welfare.

Residents in annexed territory are entitled to vote on municipal rather than township questions and they are entitled under the Constitution and laws of Ohio to reside within a

"ward" to become eligible to vote on all general issues and candidates, in addition to those of the municipality. **Art. V, Sec. 1.** In the past, the Board of Elections has exercised good judgment in recognizing ward changes without formal authority of an amendment to Section 49. It is, however, a dangerous policy for a self governing body to abandon formal or technical rights of government so as to leave the citizens at the discretion of others in their exercise of fundamental private rights.

In conclusion the court finds on the second question submitted, that the City Commission, as the legislative authority of the City of Dayton, has exclusive power to establish and change the number and boundaries of wards within the city even though all members of its legislative body are elected at large under the Charter.

The court has been informally advised that other charter cities in which members of councils or commissions are elected at large have continued to regulate wards. The situation is not one which requires legislation, however, establishment of representative political groups, particularly wards, is properly a subject for the election chapter of the Code. The question should not depend upon provisions of the statute adopted for other express purposes even though the geographical division should be the same for state as it is for municipal purposes.

An entry in accordance with this finding was prepared and filed by the court.